UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARCEL ALBERT, *professionally known as Marc Mysterio*,

                              Plaintiff,

                    -v.-

DISTROKID LLC and AMAZON.COM
SERVICES LLC,

                              Defendants.

---

25 Civ. 1705 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Marcel Albert, who among other talents performs as a musical artist under the name Marc Mysterio, brought this action to redress an alleged "shadowban" of his music on a streaming platform that Defendant Amazon.com Services LLC ("Amazon") owns and to which Defendant DistroKid LLC ("DistroKid," and together with Amazon, "Defendants") distributes Plaintiff's music. Plaintiff has asserted various state-law claims against both Defendants.

Before the Court now are two motions to dismiss: Amazon's, which seeks dismissal of each claim brought against it, and DistroKid's, which seeks dismissal of only one of three claims brought against it. For the reasons set forth below, the Court grants in part and denies in part Amazon's motion, and grants DistroKid's motion.

**BACKGROUND**[1]

### A.    Factual Background

### 1.    The Parties

Plaintiff, who claims to be a resident of Canada, is a music creator performing under the name Marc Mysterio.  (FAC ¶¶ 1, 7-11).  He is the author and copyright owner of various songs, compilations, musical works, and musical recordings.  (*Id.* ¶ 16; *see* Dkt. #27-1).  His music has received over 200,000,000 streams since 2007.  (FAC ¶ 10).

Defendant DistroKid is a Delaware corporation with its principal place of business in New York.  (FAC ¶ 2).  DistroKid provides a service for musicians that involves transmitting recordings and related content to online streaming services ("Digital Stores"), such as Amazon Music.  (*Id.* ¶ 12).  Plaintiff claims that DistroKid works by converting the musical recordings that artists upload to a format that conforms to each Digital Store's uploading requirements.  (*Id.*).

---

[1]    This Opinion draws its facts from the First Amended Complaint ("FAC" (Dkt. #27)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain of the exhibits attached to the FAC and to the Declaration of Jonathan M. Sperling (the "Sperling Declaration" (Dkt. #41)), each of which is incorporated by reference in the FAC.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference in and documents integral to a complaint).  The FAC and the Sperling Declaration have been filed under seal, but redacted public versions, complete with redacted exhibits, are available at docket entries 28 and 38, respectively.

For ease of reference, the Court refers to Defendant Amazon's memorandum of law in support of its motion to dismiss as "Amazon Br." (Dkt. #37); to DistroKid's memorandum of law in support of its motion to dismiss as "DistroKid Br." (Dkt. #40); to Plaintiff's consolidated memorandum of law in opposition to Defendants' motions as "Pl. Opp." (Dkt. #44); to Amazon's reply memorandum of law as "Amazon Reply" (Dkt. #45); to DistroKid's reply memorandum of law as "DistroKid Reply" (Dkt. #46); and to Plaintiff's surreply as "Pl. Surreply" (Dkt. #49).

2

Defendant Amazon is a Delaware corporation. (FAC ¶ 5). It operates Amazon Music, an online music streaming service. (*Id.* ¶ 13). Amazon Music makes various artists' music available through its platform. (*Id.* ¶¶ 13, 15, 128). Amazon subscribers can access this content through a subscription service called "Amazon Music Unlimited" or through a service available to Amazon Prime members, referred to as "Amazon Music Prime," both of which offer on-demand play of certain sound recordings. (*Id.* ¶ 15; Dkt. #41-2 ("2019 Addendum") § 2). Amazon Music also offers a noninteractive, ad-supported service that operates more like a radio station and does not require the listener to pay a subscription fee. (2019 Addendum § 2).

To market music to its listeners, Amazon uses an algorithm that analyzes the characteristics of songs and suggests music to subscribers that is similar to the music they have previously streamed. (FAC ¶¶ 75, 92, 115 n.7). Amazon also curates stations based on specific genres or artists. (*Id.* ¶¶ 75, 92, 115 n.7, 187).

### 2.   The Relevant Agreements

In this case, each pair of the three parties involved is connected by a contractual relationship, and much of this Opinion turns on the provisions of the relevant agreements. The Court thus discusses each here.

### a.   The Albert-DistroKid Agreement

The first relevant agreement is between Plaintiff and DistroKid. According to the FAC, Plaintiff entered into an agreement with DistroKid on or about June 8, 2021 (the "Albert-DistroKid Agreement"). (FAC ¶ 20; *see*

*generally* Dkt. #27-2 (Albert-DistroKid Agreement)).  Plaintiff paid a user fee to DistroKid and, in return, DistroKid provided Plaintiff with access to its platform.  (FAC ¶ 21).

Under the Albert-DistroKid Agreement, Plaintiff, by uploading recordings and related content to the DistroKid platform, granted DistroKid a sub-licensable non-exclusive license to reproduce and distribute that content for Digital Stores like Amazon Music "to sell or sublicense to their Customers." (Albert-DistroKid Agreement § 5).  Further, the Albert-DistroKid Agreement described in detail the process that DistroKid would follow to modify Plaintiff's files such that they were compatible with the requirements of the Digital Stores.  *(Id.* §§ 1-2).

Although the Albert-DistroKid Agreement gave Plaintiff the right to select stores to which DistroKid would distribute Plaintiff's recordings, it also specified that such stores "may choose not to carry one or more of [those] Recordings at all … (or to remove Recordings at any time) per their policies and practices," so DistroKid "c[ould]n't make any guarantees."  (Albert-DistroKid Agreement §§ 2(d)-(e); *see also* FAC ¶ 21).  In addition to licensing Plaintiff's sound recordings, the Albert-DistroKid Agreement also granted the right to display and use Plaintiff's name, logo, artwork, and likeness "on the Digital Stores' sites and services, and in any marketing, advertising or promotional materials for [DistroKid's] Service or for the Digital Stores."  (Albert-DistroKid Agreement § 5(a)(iv)).

4

Under the terms of the Albert-DistroKid Agreement, DistroKid agreed to remit to Plaintiff 100% of the royalties that it collected in connection with the exploitation of his recordings, subject to certain deductions and conditions. (Albert-DistroKid Agreement § 7(a); FAC ¶¶ 21, 24).  Plaintiff alleges that the Albert-DistroKid Agreement was renewed every year through and including 2025.  (FAC ¶ 28).

### b.    The DistroKid-Amazon Agreement

The second relevant agreement is between DistroKid and Amazon. Amazon's contractual relationship with DistroKid dates back to at least 2013. (*See* Dkt. #41-1 ("DistroKid-Amazon Audio Distribution Agreement") at 1).  At that time, Amazon's predecessor, Amazon Digital Services, Inc., entered into an agreement (the "DistroKid-Amazon Audio Distribution Agreement") with DistroKid, then operating as PK Interactive, LLC, for the "sale and distribution of digital audio recordings via the Internet in a variety of formats."  (*Id.* § 1).

That agreement provides that the parties may enter into addenda regarding specific distribution offerings, and that those addenda "shall automatically become part of this Agreement without requirement of further action by either Party."  (DistroKid-Amazon Audio Distribution Agreement § 1). Amazon and DistroKid have executed numerous offering addenda, including one from 2019 (the "2019 Addendum") and one from 2024 (the "2024 Addendum").  (*See generally* 2019 Addendum; Dkt. #41-3 ("2024 Addendum")).

Through the DistroKid-Amazon Audio Distribution Agreement, the 2019 Addendum, and the 2024 Addendum (collectively, the "DistroKid-Amazon

Agreement"), DistroKid granted Amazon nonexclusive rights to market, distribute, sell, and make available digital audio recordings that DistroKid provided to Amazon.  (*See* DistroKid-Amazon Audio Distribution Agreement § 3; 2019 Addendum § 9; 2024 Addendum § 9).  Conversely, Amazon retained the right not to exercise any of these rights.  (*See* DistroKid-Amazon Audio Distribution Agreement § 4 (noting that Amazon "shall have no obligation to sell, market or distribute the Digital Audio Recordings, or any part thereof, or to continue the same, if and once commenced"); 2019 Addendum § 18 ("Nothing in this Streaming Addendum will obligate us to exercise any of the rights you grant to us under this Streaming Addendum."); 2024 Addendum § 18 (same)).

Under the DistroKid-Amazon Agreement, Amazon agreed to pay a license fee for any nonfraudulent music play.  (DistroKid-Amazon Audio Distribution Agreement § 6; 2019 Addendum § 10; *id.*, app. A § 2(k); 2024 Addendum § 10; *id.*, app. A § 2(k)).  The agreement also established the mechanism by which Amazon would make these payments to DistroKid.  (DistroKid-Amazon Audio Distribution Agreement § 6; 2019 Addendum § 10; 2024 Addendum § 10).

### c.    The Albert-Amazon Agreement

The two agreements just discussed relate to the manner in which Plaintiff's sound recordings would make their way onto Amazon's platforms through licensing.  The third relevant agreement is separate from the licensing regime.  It involves the "Amazon Music for Artists" application, which "includes a variety of tools and features that allow artists … to gain insights into the

artists' fan bases and engage with their fans." (Dkt. #27-3 ("Terms and Conditions") § 1). Amazon Music for Artists does not alter the existing licenses of an artist's sound recordings and related materials, but it allows artists to submit supplemental materials, such as images and artwork. (*Id.* § 4.1).

Before submitting any content on the Amazon Music for Artists platform, an artist must acknowledge and agree to terms and conditions of use (the "Terms and Conditions"). (FAC ¶¶ 82, 115; *see generally* Terms and Conditions). Under the Terms and Conditions, an artist "grant[s] to [Amazon] a non-exclusive, sub-licensable, worldwide, perpetual, irrevocable, royalty-free right and license to use, reproduce, distribute, transmit, perform, modify, and display all Artist Content in any media and technology formats in connection with the Services and Amazon Music for Artists." (Terms and Conditions § 4.2). "Services" are defined as those "provided by Amazon Music." (*Id.* § 1).

The agreement thus granted Amazon the right to use Plaintiff's name, image, and likeness (or "NIL"). (FAC ¶ 186). Plaintiff accepted the Terms of Service and thus entered into a contract with Amazon (the "Albert-Amazon Agreement") so that he could "have access to Amazon's Music for Artists Application." (*Id.* ¶ 82).

### 3. The Alleged Shadowban

In or about August 2023, Plaintiff opted in the DistroKid portal to have his music catalog distributed exclusively to Amazon Music. (FAC ¶¶ 29-31). Plaintiff alleges that between August 2023 and September 2024, his music recordings were available on Amazon Music, and listeners were actively

listening to his music on the platform. (*Id.* ¶¶ 84-85). During that time, Plaintiff alleges on information and belief that Amazon paid royalties to DistroKid. (*Id.* ¶ 32). Plaintiff posits that he received royalties from DistroKid for the accounting period from December 1, 2023, to July 31, 2024, but did not receive royalties for the accounting period from August 1, 2024, to September 30, 2024. (*Id.* ¶¶ 34, 37).

Plaintiff alleges that after September 10, 2024, and up through the filing of this action, Amazon instituted a "shadowban" of his music by implementing suppression code and thereby "remov[ing his] musical recordings from Amazon's algorithm"; "block[ing] Amazon's curators from playing [his] music on similar artist channels"; and blocking his recordings "from being streamed," "requested on Alexa," and "being suggested to Amazon Music subscribers who streamed similar music." (FAC ¶¶ 93; *see also id.* ¶¶ 137, 141-142).

Plaintiff offers two theories for the shadowban. *First*, and with considerable detail, he alleges that DistroKid — when processing, compressing, and converting Plaintiff's musical recordings for transmission to Amazon Music — degraded the quality of the musical recordings "beyond the level of expected degradation." (FAC ¶ 60). As a result, Plaintiff had to resubmit his recordings so that they would have the appropriate sound quality. (*Id.* ¶ 61). Plaintiff believes that DistroKid, despite assigning the resubmissions the same ISRC Codes as the original recordings, failed to conform the metadata of the

8

resubmissions with the metadata of the original submissions. (*Id.* ¶ 63).[2]  This purportedly caused Amazon to flag the resubmissions as violative of their policies concerning metadata, which provides the basis for Amazon's proffered explanation for the shadowban (*id.* ¶¶ 69, 146).

Plaintiff acknowledges that, at the time, Amazon flagged his artist profile as "non-compliant with Industry Standards" and his music catalog "as non-compliant with ISRC Handbook and best industry standard practices." (FAC ¶ 69).  But Plaintiff also calls Amazon's invocation of the ISRC coding issue as justification for the shadowban "pre-textual." (*Id.* ¶¶ 144-146).  To substantiate his claim of pretext, Plaintiff explains that Amazon has technology (the "Audio Fingerprinting" technology) that automatically detects and fixes metadata inconsistencies and links identical recordings by ISRC Code, which technology would have corrected any errors DistroKid may have made in uploading Plaintiff's resubmissions. (*Id.*).

*Second*, and with no detail, Plaintiff alleges upon information and belief that the shadowban occurred "at the request of a rival musician or music label, to intentionally promote other artists and to damage the Plaintiff, and Amazon's employees acquiesced to said request." (FAC ¶ 143).[3]

---

[2]    "ISRC (International Standard Recording Code) is the globally recognized standard numbering system for audio and music video recordings.  It comprises a 12-digit alphanumeric code and functions as a universal identification number for each sound recording." *See Frequently Asked Questions About ISRC Codes*, ISRC, https://www.isrc.com/general-faq.html (last visited Mar. 12, 2026).

[3]    Paragraph 143 is the lone allegation related to this alternative theory for the shadowban, and no substantiation is provided for Plaintiff's information and belief.  The Court discusses the conclusory nature of this theory in connection with Plaintiff's claim for tortious interference with prospective business relations.

Plaintiff made numerous attempts to have the shadowban reversed, to no avail. (FAC ¶¶ 148-150). He alleges that the shadowban caused him to lose hundreds of thousands of fans and prevented him from earning royalties to which he was entitled. (*Id.* ¶¶ 72, 101-103, 106, 168-169). Plaintiff also argues that when Amazon instituted the shadowban, the license that Plaintiff granted to Amazon to use his NIL expired or was terminated. (*Id.* ¶ 191). And yet, Plaintiff argues, Amazon continued to use Plaintiff's NIL, including by featuring a Marc Mysterio radio station. (*Id.* ¶¶ 188-190).

## B.    Procedural Background

Plaintiff commenced this action on February 27, 2025, by filing the complaint. (Dkt. #1). On April 16, 2025, Amazon and DistroKid filed pre-motion letters regarding anticipated motions to dismiss. (Dkt. #21-22). Plaintiff responded to both letters two days later. (Dkt. #25). The Court held a pre-motion conference on April 25, 2025, at which it set a deadline for Plaintiff to file an amended complaint and scheduled briefing on Defendants' anticipated motions to dismiss. (April 25, 2025 Minute Entry).

Plaintiff filed the FAC, the operative pleading in this matter, on May 16, 2025. (Dkt. #27-28). The FAC brings the following claims: (i) breach of contract against DistroKid (FAC ¶¶ 18-47); (ii) accounting against DistroKid (*id.* ¶¶ 48-53); (iii) negligence and gross negligence against DistroKid (*id.* ¶¶ 54-77); (iv) breach of contract against Amazon (*id.* ¶¶ 78-108); (v) quasi-contract violations against Amazon (*id.* ¶¶ 109-126); (vi) tortious interference with prospective business relations against Amazon (*id.* ¶¶ 127-173); (vii) injunctive

relief against Amazon (*id.* ¶¶ 174-184); and (viii) violation of New York Civil Rights Laws §§ 50-51 against Amazon (*id.* ¶¶ 185-198).

On June 27, 2025, Amazon filed its motion to dismiss all counts against it for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), along with supporting papers. (Dkt. #36-38, 41). That same day, DistroKid filed its motion to dismiss the FAC's negligence count under Rule 12(b)(6), along with supporting papers. (Dkt. #39-40). Plaintiff filed his consolidated opposition on August 4, 2025. (Dkt. #44). Both Amazon and DistroKid replied on September 19, 2025. (Dkt. #45-46). Four days later, Plaintiff requested leave to file a surreply to address one new argument that DistroKid made in reply (Dkt. #47), which leave the Court granted (Dkt. #48). Plaintiff filed his surreply on September 26, 2025, thus concluding briefing on the instant motions. (Dkt. #49).

## DISCUSSION

### A.    Motions to Dismiss for Failure to State a Claim Under Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may seek dismissal of a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in Plaintiff['s] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (internal quotation marks omitted) (quoting *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). "[W]hen documents attached to the complaint as exhibits or incorporated by reference in the complaint contain statements that contradict the allegations in the complaint, the documents control and the Court need not accept the allegations as true." *Wimberly* v. *Experian Info. Sols.*, No. 18 Civ. 6058 (MKV), 2021 WL 326972, at *3 (S.D.N.Y. Feb. 1, 2021) (internal quotation marks omitted) (quoting *Endemann* v. *Liberty Ins. Corp.*, 390 F. Supp. 3d 362, 370 (N.D.N.Y. 2019)).

A plaintiff can overcome a Rule 12(b)(6) motion if the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [Plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)). Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

12

**B.     Analysis**

The FAC asserts three causes of action against DistroKid: (i) breach of contract, (ii) accounting, and (iii) negligence.  The FAC also asserts five causes of action against Amazon: (i) breach of contract, (ii) quasi-contract, (iii) tortious interference with prospective business relations, (iv) violations of New York Civil Rights Law §§ 50-51, and (v) injunctive relief.

DistroKid only challenges the negligence cause of action here (*see* Pl. Opp. 16 (noting that "DistroKid has not disputed the adequacy" of Counts I and II of the FAC)), and as explained below, its challenge is successful. Amazon challenges each cause of action asserted against it, and it is partially successful.  Specifically, the Court holds that Plaintiff's independent causes of action for quasi-contract violations, tortious interference, New York Civil Rights Law violations, and injunctive relief all fail to state a claim, but that Plaintiff has a valid (albeit limited) contract claim against Amazon.[4]

---

[4]     The Albert-DistroKid Agreement contains a choice-of-law provision selecting New York law.  (Albert-DistroKid Agreement § 10(h)).  The DistroKid-Amazon Agreement contains a choice-of-law provision selecting Washington law.  (DistroKid-Amazon Distribution Agreement § 10.7).  The parties rely on New York law in their respective legal analyses. (*See, e.g.*, Amazon Br. 13; DistroKid Br. 5; Pl. Opp. 18-19).  The parties' "implied consent … is sufficient to establish choice of law."  *Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (internal quotation marks omitted) (quoting *Tehran-Berkeley Civ. & Env't Eng'rs* v. *Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)); *see also Valentini* v. *Grp. Health Inc.*, No. 20 Civ. 9526 (JPC), 2021 WL 2444649, at *6 (S.D.N.Y. June 15, 2021) ("The parties do not dispute that New York law applies in this case, and the Court accordingly applies that law."), *aff'd*, No. 22-157, 2023 WL 2027273 (2d Cir. Feb. 16, 2023) (summary order).

### 1. Plaintiff's Negligence Claim Against DistroKid Fails as a Matter of Law

"[A] plaintiff must establish three elements to prevail on a negligence claim: [i] the existence of a duty on defendant's part as to plaintiff; [ii] a breach of this duty; and [iii] injury to the plaintiff as a result thereof." *Aegis Ins. Servs., Inc.* v. *7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Alfaro* v. *Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000)); *accord Nellenback* v. *Madison Cnty.*, 44 N.Y.3d 329, 334 (2025). DistroKid argues that the first prong is lacking here — that DistroKid does not owe Plaintiff a duty outside of the contract between them. (DistroKid Br. 5-7). *See Espinal* v. *Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 138 (2002) ("Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party[.]"). DistroKid is correct.

To support a negligence claim, the duty the alleged tortfeasor owes "must be independent of any contract." *OTG Brands, LLC* v. *Walgreen Co.*, No. 13 Civ. 9066 (ALC), 2015 WL 1499559, at *10 (S.D.N.Y. Mar. 31, 2015) (citing *Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)); *accord Uzoigwe* v. *Charter Commc'ns, LLC*, No. 24-1399-cv, 2025 WL 1257578, at *3 (2d Cir. May 1, 2025) (summary order), *cert. denied*, No. 25-643, 2026 WL 490625 (U.S. Feb. 23, 2026); *IKB Int'l, S.A.* v. *Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 290-91 (2023)). "Merely charging a breach of a 'duty of due care[,]' employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim." *Clark-Fitzpatrick*, 70 N.Y.2d at

14

390. And "in general, there is no duty of care between parties to an arm's-length business relationship." *OTG Brands*, 2015 WL 1499559, at *10 (internal quotation marks omitted and alteration adopted) (quoting *Tech. Support Servs., Inc.* v. *Int'l Bus. Machs. Corp.*, 856 N.Y.S.2d 26 (Table), 2007 WL 4500382, at *28 (N.Y. Sup. Ct. Dec. 3, 2007)).

Here, any alleged duty that DistroKid owed Plaintiff flows from their contract. Plaintiff asserts that "DistroKid had a duty to properly convert and embed Plaintiff's music with metadata and assign ISRC codes." (Pl. Opp. 1). But the process that DistroKid allegedly performed negligently is outlined in the Albert-DistroKid Agreement and does not exist independently. (Albert-DistroKid Agreement §§ 1(c)-(e)). "These allegations are 'merely a restatement, albeit in slightly different language, of the … contractual obligations asserted in the cause of action for breach of contract.'" *OTG Brands*, 2015 WL 1499559, at *10 (quoting *Clark-Fitzpatrick*, 70 N.Y.2d at 390).

Plaintiff's retort is that "[t]he negligent performance of a contract gives rise to a tort claim … because the mere existence of a contract does not dispense with the duty to exercise ordinary care." (Pl. Opp. 42). To be sure, the Second Circuit, nearly 50 years ago, stated that under New York law, "[n]egligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract," and that "[t]he two claims may be submitted as alternatives to the jury." *Ajax Hardware Mfg. Corp.* v. *Indus. Plants Corp.*, 569 F.2d 181, 185 (2d Cir. 1977). But that case predated the New York Court of Appeals' decision in *Clark-Fitzpatrick*, which upheld the

15

dismissal of a negligence claim based on the "well-established principle that a simple breach of contract is not to be considered a tort."  70 N.Y.2d at 389.

Furthermore, the case law on which Plaintiff relies is readily distinguishable from the instant case because in each of those cases, the plaintiff's negligence claim was based on a duty that existed independent of the contract.  For example, in *Sommer* v. *Federal Signal Corp.*, the Court of Appeals allowed negligence and breach of contract claims to go forward against a fire alarm company that failed to send a fire alarm signal to the fire department because notwithstanding the contract, there was "a significant public interest" in the fire alarm company performing its service with a duty of care.  79 N.Y.2d 540, 552-53 (1992) (noting that the defendant's "duty to act with reasonable care is not only a function of its private contract ... but also stems from the nature of its services"); *see also Banco Multiple Santa Cruz, S.A.* v. *Moreno*, 888 F. Supp. 2d 356, 369-74 (E.D.N.Y. 2012) (allowing a negligence claim by a variable annuity holder to go forward against the insurance company that issued the annuity because of the "public policy interest" at issue).

Plaintiff has identified no significant public interest or special relationship arising between himself and DistroKid that exists apart from their contract, so his negligence claim cannot stand.  *See Avazpour Networking Servs.* v. *Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 364 (E.D.N.Y. 2013) ("New York law is clear in limiting imposition of a duty, the breach of which can support a claim in tort, to a limited class of professionals and circumstances."); *Busino* v. *Meachem*, 704 N.Y.S.2d 690, 693-94 (3d Dep't 2000) ("A 'special

relationship' requires a closer degree of trust than an ordinary business relationship[.]"); *cf. In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) ("When parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." (internal quotation marks omitted and alteration adopted) (quoting *Pan Am. Corp.* v. *Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994))).[5]

### 2.    Plaintiff's Contract Claim Against Amazon Is Legally Cognizable

The Court next turns to Plaintiff's claims against Amazon.  In addition to suing DistroKid for a breach of the Albert-DistroKid Agreement (FAC ¶¶ 18-47), Plaintiff also seeks to sue Amazon under the DistroKid-Amazon Agreement (*id.* ¶¶ 78-108).  Amazon argues that Plaintiff may not maintain such a claim because he is not a party to the DistroKid-Amazon Agreement, nor otherwise in privity with Amazon.  (Amazon Br. 8-11).  Amazon also argues that, in any event, Plaintiff has not alleged breach by Amazon.  (*Id.* at 11-13).  Given the

---

[5]    While the Court agrees with DistroKid that Plaintiff may not raise a negligence claim against it, the Court is not persuaded by DistroKid's argument that the Albert-DistroKid Agreement precludes Plaintiff's negligence claim.  (*See* DistroKid Reply 3-4).  The contractual language that DistroKid points to limits DistroKid's liability for "indirect … damages … for any acts or omissions of digital stories or their customers, ID services, or for your use of or access to the site or service."  (Albert-DistroKid Agreement § 9(b)).  As Plaintiff points out, this appears to limit vicarious liability for the acts of Digital Stores and their customers, not direct liability for DistroKid's own acts.  (*See* Pl. Surreply 1-2).

DistroKid's reading of the contract would also preclude Plaintiff's breach of contract claim given that "contract" is listed alongside "negligence" in the list of released claims.  (*See* Albert-DistroKid Agreement § 9(b)).  The Court tends to agree with Plaintiff that reading the disclaimer this broadly would contravene New York public policy.  (Pl. Surreply 3).

17

procedural posture of the case, the Court disagrees with Amazon on both fronts.  Specifically, the Court finds Plaintiff's allegations sufficient (i) to permit him to enforce the DistroKid-Amazon Agreement as a third-party beneficiary, and (ii) to allege a violation of the covenant of good faith and fair dealing.

### a.    Plaintiff and Amazon Are in Privity with Respect to the Licensing of Plaintiff's Recordings

"It is well established that a plaintiff in a breach of contract action 'may not assert a cause of action to recover damages for breach of contract against a party with whom it is not in privity.'"  *Yucyco, Ltd.* v. *Republic of Slovenia*, 984 F. Supp. 209, 215 (S.D.N.Y. 1997) (quoting *Perma Pave Contracting Corp.* v. *Paerdegat Boat & Racquet Club, Inc.*, 549 N.Y.S.2d 57, 58 (2d Dep't 1989)); *accord Price Trucking Corp.* v. *Norampac Indus., Inc.*, 748 F.3d 75, 84 (2d Cir. 2014).  Plaintiff is not a party to the DistroKid-Amazon Agreement.  (Amazon Br. 8-9).  But Plaintiff asserts that he may nonetheless enforce the DistroKid-Amazon Agreement against Amazon for three reasons, one of which is successful.  (Pl. Opp. 17-23).

### i.    The Albert-Amazon Agreement Does Not Empower Plaintiff to Enforce the DistroKid-Amazon Agreement

*First*, Plaintiff intimates that he should be able to enforce the DistroKid-Amazon Agreement because he agreed to the Terms and Conditions related to his Amazon Music for Artists application.  (Pl. Opp. 17 (making this argument in one sentence); FAC ¶¶ 82-83).  As Amazon explains, this claim is meritless.  (Amazon Br. 9-10).  Specifically, the Albert-Amazon Agreement is irrelevant to Plaintiff's contract claims in the FAC because the Albert-Amazon Agreement

does not address the licensing of Plaintiff's recordings at all, nor does it place any obligation on Amazon to make those recordings available. (*See, e.g.*, Terms and Conditions § 8.4 (noting that the Agreement "governs [the] use of Amazon Music for Artists" but not mentioning any other applicability)). As such, the lone agreement alleged between Plaintiff and Amazon does nothing to establish privity with respect to the DistroKid-Amazon Agreement.

### ii.      DistroKid Did Not Act as Plaintiff's Agent

*Second*, Plaintiff claims that DistroKid was acting as his agent for the purposes of the DistroKid-Amazon Agreement. (Pl. Opp. 18-20). But for a number of reasons, the Court holds, as a matter of law, that the relationship between Plaintiff and DistroKid does not rise to the level of principal and agent. *See Veleron Holding, B.V.* v. *Morgan Stanley*, 117 F. Supp. 3d 404, 451 (S.D.N.Y. 2015) ("Only if 'the facts are insufficient to support a finding of agency or the facts are not in dispute, can the question of agency can be resolved as a matter of law.'" (alteration adopted) (quoting *Samba Enters., LLC* v. *iMesh, Inc.*, No. 06 Civ. 7660 (DC), 2009 WL 705537, at *7 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom., Samba Enters., Ltd.* v. *iMesh, Inc.*, 390 F. App'x 55 (2d Cir. 2010) (summary order))).

To start, the Albert-DistroKid Agreement specifically provides that "[t]he relationship between the parties is that of independent contractors," and "neither party is the other's agent." (Albert-DistroKid Agreement § 10(g)). Plaintiff points out that the Court can disregard this express contractual disclaimer of agency if the nature of the parties' agreement otherwise satisfies

19

the requirements to create an agency relationship. (Pl. Opp. 19-20). That may be true in some settings. *See, e.g.*, *Bos. Tea Co., LLC* v. *Bay Valley, LLC*, No. 17 Civ. 4742 (ALC), 2018 WL 4211313, at *5 (S.D.N.Y. Sept. 4, 2018) ("Despite a provision in the Distribution Agreement that states MSRF is not Defendant's agent, MSRF's actions … raise questions regarding the relationship between Defendant and MSRF." (citation omitted)); *St. Francis Holdings, LLC* v. *MMP Cap., Inc.*, No. 20 Civ. 4636 (MKB), 2022 WL 991980, at *10 (E.D.N.Y. Mar. 31, 2022) ("However, contractual agency disclaimers are not always dispositive, and a court may look to the facts and circumstances of the parties' relationship to determine whether an agent-principal relationship existed." (collecting cases)); *Great Am. Ins. Co.* v. *Gemstone Prop. Mgmt. LLC*, No. 23 Civ. 9100 (LJL), 2025 WL 2196886, at *11 (S.D.N.Y. Aug. 1, 2025) (similar). Plaintiff cannot make such a showing here.

The "paramount" indicator of an agency relationship is the principal's control over the agent. *Nuevo Mundo Holdings* v. *Pricewaterhouse Coopers LLP*, No. 03 Civ. 613 (GBD), 2004 WL 112948, at *5 (S.D.N.Y. Jan 22, 2004) ("There is no agency relationship where the alleged principal has no right of control over the alleged agent." (internal quotation marks omitted) (quoting *Morgan Guar. Tr. Co. of N.Y.* v. *Republic of Palau*, 657 F. Supp. 1475, 1481 n.2 (S.D.N.Y. 1987))); *see In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005) ("The element of control often is deemed the essential characteristic of the principal-agent relationship."); Restatement (Third) Of Agency § 1.01 (2006) ("Agency is the fiduciary relationship that arises when one person (a 'principal')

20

manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf *and subject to the principal's control,* and the agent manifests assent or otherwise consents so to act." (emphasis added)).  Here, Plaintiff has not alleged sufficient control over DistroKid.

Plaintiff's best argument is that DistroKid agreed to submit his music to the Digital Stores that Plaintiff selected.  (Pl. Opp. 20).  But that is not enough. For one, despite Plaintiff's ability to select Digital Stores to which DistroKid would submit his music, the Albert-DistroKid Agreement expressly reserves DistroKid's rights to decline to provide its distribution services "for any … reason in [its] business judgment."  (Albert-DistroKid Agreement § 2(e)). Additionally, Plaintiff has no say over the terms, renewal, or termination of any agreement that DistroKid may enter with any Digital Store.  (*Id.*).[6]

Plaintiff attempts to analogize the instant case to *Flickinger* v. *Harold C. Brown & Co.*, a case in which the Second Circuit held that an agency relationship existed between the plaintiff and his broker when the broker agreed to acquire shares of a security and to deliver them to the plaintiff in

---

[6]    Plaintiff also argues that the indemnification provision in the Albert-DistroKid Agreement indicates an agency relationship (Pl. Opp. 20 (citing *Veleron Holding, B.V.* v. *Morgan Stanley*, 117 F. Supp. 3d 404, 455 (S.D.N.Y. 2015))), but as Amazon points out, the indemnification provision here is different from those that other courts have found to indicate a principal-agent relationship (Amazon Reply 2).

Specifically, in *Veleron*, the principal agreed to indemnify the agent for all claims arising from "[the agent]'s engagement."  117 F. Supp. 3d at 455 (internal quotation marks omitted).  That is consistent with the agent not being able to exercise independent judgment for which it may bear liability.  The indemnification provision in the Albert-DistroKid Agreement is different.  It provides that Plaintiff (the alleged principal) would indemnify DistroKid (the alleged agent) for claims resulting from Plaintiff's *own* conduct. (Albert-DistroKid Agreement § 8(b)).  This says little about Plaintiff's control over DistroKid.

exchange for a commission.  947 F.2d 595, 600 (2d Cir. 1991).  (*See* Pl. Opp. 19).  But in that case, there was no indication that the broker retained any control over what purchases the plaintiff made or how to execute those purchases.  Instead, the plaintiff paid the broker a commission for making specific purchases that the broker was contractually obligated to make. *Flickinger*, 947 F.2d at 600 ("[The Agent], in sum, breached its contract with [the principal] when it failed to deliver the securities to him.").

Not so here.  Plaintiff paid DistroKid for access to DistroKid's platform (FAC ¶ 21), not for any purchases DistroKid would make on Plaintiff's behalf. And DistroKid retained ultimate control over how and whether it implemented Plaintiff's requests.  (*See* Albert-DistroKid Agreement § 2(e)).  Paired with the parties' express agreement that no agency relationship existed, DistroKid's control in its business interactions with both Plaintiff and Amazon refutes as a matter of law Plaintiff's conclusory assertion that DistroKid was his agent.

### iii.   Plaintiff Has Adequately Pleaded That He Is a Third-Party Beneficiary to the DistroKid-Amazon Agreement

Plaintiff may not have alleged facts sufficient to suggest that DistroKid was his agent, but he may still recover against Amazon as a third-party beneficiary of the DistroKid-Amazon Agreement.  "To create a third party right to enforce a contract, 'the language of the contract' must '*clearly* evidence an intent to permit enforcement by the third party.'"  *Consol. Edison, Inc.* v. *Ne. Utils.*, 426 F.3d 524, 528 (2d Cir. 2005) (alterations adopted) (quoting *Fourth Ocean Putnam Corp.* v. *Interstate Wrecking Co., Inc.,* 66 N.Y.2d 38, 45 (1985)).

22

But when assessing the contract, a court may also examine "the surrounding circumstances." *Septembertide Publ'g, B.V.* v. *Stein & Day, Inc.*, 884 F.2d 675, 679 (2d Cir. 1989); *accord Subaru Distribs. Corp.* v. *Subaru of Am.*, 425 F.3d 119, 126 (2d Cir. 2005).

While the intent to allow enforcement by a third party must be clear, "the identity of [the] third-party beneficiary need not be known at the time of a contract's execution." *In re Houbigant Inc.*, 914 F. Supp. 964, 985 (S.D.N.Y. 1995) (citing *M.K. W. St. Co.* v. *Meridien Hotels, Inc.*, 584 N.Y.S.2d 310, 313 (1st Dep't 1992)); *accord Bd. of Managers of 110 Congress Condo.* v. *SDS Cong., LLC*, 59 N.Y.S.3d 381, 383-84 (2d Dep't 2017). Moreover, when assessing intent, "[t]he focus is on the intent of the promisee, inasmuch as 'the promisee procured the promise by furnishing the consideration therefor.'" *Logan-Baldwin* v. *L.S.M. Gen. Contractors, Inc.*, 942 N.Y.S.2d 718, 720-21 (4th Dep't 2012) (quoting *Drake* v. *Drake*, 455 N.Y.S.2d 420, 422 (4th Dep't 1982)); *accord CB ex rel. Suarez* v. *Howard Sec.*, 69 N.Y.S.3d 587, 593-94 (1st Dep't 2018). In sum, "[a] beneficiary will be considered an intended beneficiary" of a contract "when the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *DeLine* v. *CitiCapital Com. Corp.*, 807 N.Y.S.2d 247, 248-49 (4th Dep't 2005) (internal quotation marks omitted) (quoting *Tasseff* v. *Nussbaumer & Clarke, Inc.*, 747 N.Y.S.2d 621, 622-23 (4th Dep't 2002)); *accord Fourth Ocean Putnam Corp.*, 66 N.Y.2d at 44.

Amazon argues that the necessary intent is absent here because the DistroKid-Amazon Agreement contains a non-assignment provision, a provision directing notice to party representatives, and a merger provision.  (Amazon Br. 11).  *See Fashion One Television LLC* v. *Fashion TV Programmgesellschaft MbH*, No. 16 Civ. 5328 (JMF), 2017 WL 3610513, at *1 (S.D.N.Y. Aug. 22, 2017) (noting that these types of provisions usually undermine third-party beneficiary claims).  Furthermore, under the DistroKid-Amazon Agreement, Amazon pays royalties to DistroKid, not Plaintiff (*see* DistroKid-Amazon Audio Distribution Agreement § 6; 2019 Addendum § 10; 2024 Addendum § 10), so performance is not "rendered directly to" the third party, *Flickinger*, 947 F.2d at 600.  (*See* Amazon Reply 3).

These factors weigh in Amazon's favor, but they overlook key provisions of the agreement, as well as relevant surrounding circumstances, that evince an intent to make the DistroKid-Amazon Agreement enforceable by Plaintiff.  As for the text, the DistroKid-Albert Agreement multiple times references that artists like Plaintiff will be "due" "royalties and other income" based on the Agreement.  (DistroKid-Amazon Audio Distribution Agreement § 5.1; *see also id.* § 7.1).

More importantly, the DistroKid-Amazon Agreement includes an indemnity provision that specifies that DistroKid "shall … indemnify, defend and hold [Amazon] … harmless from and against any loss, claim, liability, damage, action or cause of action … that arises from any claims that [Amazon]'s exercise of its rights hereunder violates any law or the right of any

24

third party." (DistroKid-Amazon Audio Distribution Agreement § 7.4). That indemnity provision specifically acknowledges that a third party, like Plaintiff, may sue Amazon — though Amazon would be indemnified — for the actions it takes under the contract, exactly the scenario here.

Further support for the finding that Plaintiff was an intended beneficiary of the DistroKid-Amazon Agreement comes from the "surrounding circumstances." *Septembertide Publ'g, B.V.*, 884 F.2d at 679. Here, DistroKid agreed to remit to Plaintiff 100% of the royalties that it received from Amazon (Albert-DistroKid Agreement § 7(a)), which demonstrates a clear intent on the part of DistroKid to make Plaintiff the immediate beneficiary of Amazon's promise to pay royalties. Indeed, New York courts repeatedly emphasize that it is the intent of the promisee — here, DistroKid — that matters when assessing third-party beneficiary status. *See, e.g.*, *Logan-Baldwin*, 942 N.Y.S.2d at 720; *CB ex rel. Suarez*, 69 N.Y.S.3d at 593-94; *Fourth Ocean Putnam Corp.*, 66 N.Y.2d at 44.[7]

It is hard to imagine how DistroKid could make its intent clearer. As Plaintiff points out, given the terms of the Albert-DistroKid Agreement, DistroKid stands to lose nothing if Amazon does not pay royalties that it owes

---

[7]    The Court agrees with Plaintiff that *Fashion One Television LLC* v. *Fashion TV Programmgesellschaft MbH*, No. 16 Civ. 5328 (JMF), 2017 WL 3610513 (S.D.N.Y. Aug. 22, 2017), is distinguishable from the instant case. (Pl. Opp. 23). In that case, a corporation claimed third-party beneficiary status by relying on affiliations between itself and one of the corporate parties to a contract. *Fashion One Television LLC*, 2017 WL 3610513, at *1-2. The court noted that while those circumstances indicated a close corporate relationship, they said nothing about any *intent* to allow the third party to enforce the contract. *Id.* at *2. Here, however, intent is evident from, among other things, the fact that Plaintiff ultimately was entitled to 100% of the royalties owed under the DistroKid-Amazon Agreement. (Albert-DistroKid Agreement § 7(a)).

25

under the DistroKid-Amazon Agreement.  (Pl. Opp. 26, 31).  By offloading to Plaintiff its incentive to induce Amazon's performance of the DistroKid-Amazon Agreement, DistroKid has indicated its intent to make Plaintiff a third-party beneficiary.  Plaintiff thus may enforce the DistroKid-Amazon Agreement on this theory.[8]

### b.   Plaintiff Adequately Alleged a Violation of the Covenant of Good Faith and Fair Dealing Under the DistroKid-Amazon Agreement

While Plaintiff may enforce the DistroKid-Amazon Agreement, the question remains of whether Plaintiff has sufficiently alleged a breach.  Plaintiff appears to concede that Amazon did not violate any express term of the DistroKid-Amazon Agreement.  Instead, he argues only that the alleged shadowban violated the covenant of good faith and fair dealing.  (Pl. Opp. 26-31).  At this stage, the Court finds that Plaintiff has adequately pleaded such a claim.

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance."  *511 W. 232nd Owners Corp.* v. *Jennifer*

---

[8]   Plaintiff also appears to argue that through its conduct, Amazon entered into an implied-in-fact contract with Plaintiff. (Pl. Opp. 23-25).  As Amazon points out, this theory is unavailing. (Amazon Reply 4-5).  Specifically, "a contract cannot be implied *in fact* where … there is an express contract covering the subject-matter involved." *Bader* v. *Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 413 (S.D.N.Y. 2011) (internal quotation marks omitted) (quoting *Ludemann Elec., Inc.* v. *Dickran*, 903 N.Y.S.2d 532, 534 (2d Dep't 2010); *see also Julien J. Studley, Inc.* v. *N.Y. News, Inc.*, 70 N.Y.2d 628, 629 (1987) (similar).  Here, there is no dispute that a contract covers the subject matter of Amazon's payment of royalties for plays of Plaintiff's music — the only dispute is whether Plaintiff himself may enforce that contract. *See, e.g.*, *Auquilla* v. *Villa*, 233 N.Y.S.3d 79, 91 (2d Dep't 2025) ("The relevant inquiry … remains not whether the owners are signatories or nonsignatories to the … agreement, but rather whether the … agreement 'covers the subject matter involved[.]'" (alteration adopted) (quoting *Julien J. Studley*, 70 N.Y.2d at 629)).  Consequently, Plaintiff has not adequately pleaded an implied-in-fact contract.

*Realty Co.*, 98 N.Y.2d 144, 153 (2002).  "The implied covenant of good faith and fair dealing bars a party from taking actions 'so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties.'"  *LJL 33rd St. Assocs., LLC* v. *Pitcairn Props. Inc.*, 725 F.3d 184, 195 (2d Cir. 2013) (quoting *Bank of China* v. *Chan*, 937 F.2d 780, 789 (2d Cir. 1991)); *see generally Lowry* v. *OppenheimerFunds, Inc.*, No. 20 Civ. 2288 (VSB), 2022 WL 976823, at *5 (S.D.N.Y. Mar. 31, 2022) ("However, the implied covenant arises 'only in connection with the rights or obligations set forth in the terms of the contract … and cannot create duties that negate explicit rights under a contract.'" (quoting *Paul* v. *Bank of Am. Corp.*, No. 09 Civ. 1932 (ENV) (JMA), 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011)))).

Amazon argues that Plaintiff's claim based on the covenant of good faith and fair dealing fails because "it directly contradicts the express terms of the DistroKid-Amazon Agreement."  (Amazon Br. 12-13).  *See Spanki Enters., Inc.* v. *Telewizja Polska, S.A.*, No. 10 Civ. 4933 (ALC) (GWG), 2014 WL 11462735 (S.D.N.Y. Mar. 6, 2014) ("[T]he covenant cannot impose obligations on the parties that contradict the express terms of the contract."), *aff'd*, 604 F. App'x 33 (2d Cir. 2015) (summary order); *accord Horn* v. *N.Y. Times*, 100 N.Y.2d 85, 92 (2003).  As Amazon explains, under the DistroKid-Amazon Agreement, Amazon is under no obligation to distribute Plaintiff's music.  (DistroKid-Amazon Audio Distribution Agreement § 4 ("[Amazon] shall have no obligation to sell, market or distribute the Digital Audio Recordings, or any part thereof,

27

or to continue the same, if and once commenced."); 2019 Addendum § 18 ("Nothing in this Streaming Addendum will obligate us to exercise any of the rights you grant us under this Streaming Addendum."); 2024 Addendum § 18 (same)).

Based on these provisions, Amazon asserts that an alleged shadowban could not violate the covenant of good faith and fair dealing because Amazon did not need to offer Plaintiff's music to listeners. (Amazon Reply 3-4). But Amazon misinterprets the nature of Plaintiff's claim. Plaintiff does not claim that Amazon was required to make his music available, only that Amazon had an "obligation to act in good faith" when making and implementing any such decision. (Pl. Opp. 27). Indeed, a party may violate the implied covenant of good faith and fair dealing without contravening explicit provisions of the contract. *Orange Cnty. Choppers, Inc.* v. *Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 559-60 (S.D.N.Y. 2007).

In the analogous context of licensing agreements, "courts have held that 'express limitations on marketing obligations do not dampen a licensee's obligation to use reasonable marketing efforts.'" *Bos. Tea Co.*, 2018 WL 4211313, at *4 (quoting *Washington* v. *Kellwood Co.*, No. 05 Civ. 10034 (SN), 2016 WL 3920348, at *6 (S.D.N.Y. July 15, 2015), *aff'd*, 714 F. App'x 35 (2d Cir. 2017) (summary order), *cert denied*, 584 U.S. 993 (2018)). And here, Plaintiff has stated a viable claim that Amazon did not meet its duty of good faith and fair dealing when it instituted a shadowban based on purported ISRC coding problems despite the fact that Amazon has — and consistently uses —

28

Audio Fingerprinting technology that automatically detects and fixes metadata inconsistencies, which technology would have corrected any error.  (FAC ¶¶ 144-146).  Plaintiff has thus stated a viable — but narrow — breach of contract claim against Amazon.[9]

### 3.  Plaintiff's Quasi-Contract Claim Against Amazon Fails as a Matter of Law

Because the licensing of and payments for the streaming of Plaintiff's sound recordings are governed by the express terms of the Albert-DistroKid Agreement and the DistroKid-Amazon Agreement, his claim for quasi-contract must be dismissed.  *See Clark-Fitzpatrick,* 70 N.Y.2d at 388 ("A 'quasi-contract' only applies in the absence of an express agreement[.]").  This is especially true in light of the Court's prior holding that Plaintiff may assert a breach of contract claim against Amazon flowing from the DistroKid-Amazon Agreement. *See supra* B.2.  Indeed, even Plaintiff appears to acknowledge that his quasi-contract theory would only be relevant "should the Court find that Plaintiff cannot enforce a contractual right against Amazon."  (Pl. Opp. 25).  As such, the Court dismisses Plaintiff's quasi-contract claim.

---

[9]    The Court notes that Plaintiff has not raised allegations of bad faith beyond Amazon's reasoning for the alleged shadowban.  Discovery in Plaintiff's case against Amazon will thus focus on that point.  *See Bos. Tea Co., LLC* v. *Bay Valley, LLC,* No. 17 Civ. 4742 (ALC), 2018 WL 4211313, at *4 (S.D.N.Y. Sept. 4, 2018) ("To the extent that Defendant had reasonable motivations for its choices, these are questions of fact properly reserved for summary judgment or trial.").

4.    **Plaintiff's Tortious Interference Claim Against Amazon Fails as a Matter of Law**

To state a claim for tortious interference with prospective business relations, a plaintiff must allege that "[i] there was a business relationship with a third party; [ii] defendant 'knew of that relationship and intentionally interfered with it'; [iii] defendant either acted 'solely out of malice' or used wrongful means; and [iv] defendant's 'interference caused injury to the relationship' with the third party." *Vinas* v. *Chubb Corp.*, 499 F. Supp. 2d 427, 434 (S.D.N.Y. 2007) (quoting *Masefield AG* v. *Colonial Oil Indus.*, No. 05 Civ. 2231 (PKL), 2006 WL 346178, at *8 (S.D.N.Y. Feb. 15, 2006)); *see also Goldhirsh Grp., Inc.* v. *Alpert*, 107 F.3d 105, 108-09 (2d Cir. 1997). Amazon contends that Plaintiff fails to plead the first and third elements. (Amazon Br. 13-16). The Court ultimately holds that Plaintiff has alleged a cognizable business relationship but has not adequately alleged malice or wrongful means, such that his tortious interference claim cannot go forward.

a.    **Plaintiff Has Pleaded a Cognizable Business Relationship**

Amazon first argues that Plaintiff has "fail[ed] to allege any existing economic relationship between [himself] and Amazon Music subscribers." (Amazon Br. 14). In support, they point out that "Amazon Music subscribers pay subscription fees to *Amazon* — not to Plaintiff." (*Id.*). But Amazon's view of what counts as an economic relationship sufficient to support a tortious interference claim is too narrow.

All a plaintiff must allege is an "existing business relationship through which plaintiff would have done business but for the allegedly tortious

30

behavior." *Kramer* v. *Pollock-Krasner Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995) (citing *PPX Enters., Inc.* v. *Audiofidelity Enters., Inc.*, 818 F.2d 266, 269 (2d Cir. 1987), *abrogated on other grounds as recognized by, Hannex Corp.* v. *GMI, Inc.*, 140 F.3d 194, 206 n.9 (2d Cir. 1998)). "[A] valid contract," however, "is not necessary." *Hannex Corp.*, 140 F.3d at 205; *see also, e.g.*, *Bos. Tea Co.*, 2018 WL 4211313, at *7 (noting that despite the lack of a governing contract, the plaintiff "still had a business connection" to entities who "actively purchased Plaintiff's products").

Here, Plaintiff argues that Amazon's alleged "shadowban directly blocked [his] fans … from accessing his music, which directly interfered with Plaintiff's … economic relationship with his fans." (Pl. Opp. 33). This is enough. Plaintiff would have made money in royalties from Amazon Music listeners in the absence of a shadowban, which is enough to establish a "business relationship." *See Kramer*, 890 F. Supp. at 258.

Amazon places heavy weight on the fact that the customers pay Amazon directly, rather than Plaintiff. (*See* Amazon Reply 5-6 & n.2 (arguing that other cases are distinguishable because they involve "communications with the plaintiff's own customers")). But there is no indication in the case law that *how* a plaintiff makes money from the third party is material — all that matters is *that* the plaintiff intends to make money from engagement with the third party. *See, e.g.*, *Four Star Cap. Corp.* v. *Nynex Corp.*, 183 F.R.D. 91, 103 (S.D.N.Y. 1997) (noting that "[t]he relationship between plaintiff and the third party need not" and "generally does not rise to the level of a contract"); *Dichello Distribs.,*

31

*Inc.* v. *Anheuser-Busch, LLC*, 715 F. Supp. 3d 220, 270 (D. Conn. 2024) ("[Plaintiff] need only show that it had a business relationship with [the third party], not a contractual one."). Consequently, Plaintiff here has alleged a cognizable business relationship with his listeners on Amazon Music.

### b.    Plaintiff Has Not Adequately Pleaded Malice or Wrongful Means

While Plaintiff has established that he has a cognizable business relationship with people who listen to his music on Amazon Music, he has not adequately alleged the third element of his claim, which is that Amazon "acted 'solely out of malice' or used wrongful means." *See Vinas*, 499 F. Supp. 2d at 434 (quoting *Masefield*, 2006 WL 346178, at *8). This is because each of Plaintiff's allegations of malice or wrongful means is conclusory and does not reach the level of "plausibility" that *Twombly* and *Iqbal* require. *See Twombly*, 550 U.S. at 564; *see also Iqbal*, 556 U.S. at 681 (noting that the plausibility standard must be assessed after removing "conclusory" allegations).

This prong of Plaintiff's tortious interference claim requires him to prove that Amazon engaged in conduct that (i) "was criminal or independently tortious," (ii) was "for the sole purpose of inflicting intentional harm," or (iii) though not a crime or tort in itself, was otherwise so "egregious" and "culpable" such that it could form the basis for a tortious interference claim. *Carvel Corp.* v. *Noonan*, 3 N.Y.3d 182, 190-91 (2004) (internal quotation marks omitted) (first quoting *NBT Bancorp, Inc.* v. *Fleet/Norstar Fin. Grp., Inc.*, 628 N.Y.S.2d 408, 410 (3d Dep't 1995), *aff'd*, 87 N.Y.2d 614 (1996); then quoting *NBT Bancorp, Inc.* v. *Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621 (1996));

*accord Lynch Dev. Assocs., Inc.* v. *Johnson*, 195 N.Y.S.3d 784, 786 (2d Dep't 2023) (collecting cases).

The allegations that are relevant to Plaintiff's claim of malice or wrongful means are the following:  Plaintiff claims that the shadowban (i) was done "at the request of a rival musician or music label, to intentionally promote other artists and to damage the Plaintiff" (FAC ¶ 143); (ii) "was a wrongful act, and was done maliciously without cause or justification" (*id.* ¶ 147); and (iii) "was wrongful, immoral, morally culpable, tortious and without legal justification" (*id.* ¶ 166).  The Court can easily disregard the latter two allegations as conclusory.  *See Iqbal*, 556 U.S. at 681.

That leaves only the bare allegation, made "[u]pon information and belief," that some unknown rival musician or label requested that Amazon institute a shadowban of Plaintiff's music, and Amazon acquiesced to that request.  (FAC ¶ 143).  Ultimately, the Court must disregard that allegation as well because it is entirely devoid of substantiation.  Plaintiff provides no related factual allegations, does not identify the offending musician or label, and omits any explanation for the action.[10]  "The Second Circuit has affirmed the rejection of similarly unsubstantiated allegations where, as here, they are made upon information and belief."  *Morana* v. *Park Hotels & Resorts, Inc.*, No. 20 Civ. 2797 (RA), 2021 WL 1164010, at *5 (S.D.N.Y. Mar. 26, 2021) (collecting cases); *see, e.g.*, *Pyskaty* v. *Wide World of Cars, LLC*, 856 F.3d 216, 226 (2d Cir.

---

[10]    Plaintiff's allegation is rendered all the more speculative by the fact that his alternative theory for the shadowban — issues stemming from metadata inconsistences — is so well substantiated and logical.  (*See* FAC ¶¶ 60-69).

2017) (rejecting an allegation that defendant "engaged in similarly fraudulent transactions on other occasions" as "entirely speculative").  Such bare speculation of improper motive cannot support, especially on its own, a claim of wrongful means.  *See Citizens United* v. *Schneiderman,* 882 F.3d 374, 384 (2d Cir. 2018) ("A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory."); *Morren* v. *N.Y. Univ.,* No. 20 Civ. 10802 (JPO) (OTW), 2022 WL 1666918, at *18 (S.D.N.Y. Apr. 29, 2022) ("Plaintiff's beliefs — however strongly he may hold them — are not facts." (collecting cases)), *report and recommendation adopted,* 2022 WL 1665013 (S.D.N.Y. May 25, 2022).

Without those three allegations, Plaintiff has not alleged facts necessary to give rise to a tortious interference claim.  He has not alleged that Amazon has engaged in criminal or independently tortious conduct, or that Amazon's conduct was for the sole purpose of inflicting intentional harm.  *See Carvel Corp.,* 3 N.Y.3d at 190.  So he must hang his hat on the more amorphous idea that Amazon's conduct was otherwise so egregious to give rise to a claim.  *See id.* at 190-91.  In this regard, Plaintiff argues that the shadowban itself "is so dishonest and unfair" that it qualifies as wrongful means.  (Pl. Opp. 34-36).

In support, Plaintiff points out several cases in which courts have found boycotts, censorship, and indeed shadowbans to give rise to liability for tortious interference.  (Pl. Opp. 34-36).  *See, e.g., IQ Dental Supply, Inc.* v. *Henry Schein, Inc.,* 924 F.3d 57, 69 (2d Cir. 2019) (allowing a plaintiff's claims to go forward because it had "plausibly alleged that it suffered an antitrust

34

injury resulting from … a direct boycott of its business"); *e-ventures Worldwide, LLC* v. *Google, Inc.*, 188 F. Supp. 3d 1265, 1278-79 (M.D. Fla. 2016) (allowing an action for tortious interference under Florida law to proceed based upon Google's removal of certain websites from their search engine); *Dangaard* v. *Instagram, LLC*, No. C 22-01101 (WHA), 2022 WL 17342198, at *2 (N.D. Cal. Nov. 30, 2022) (allowing a tortious interference action to go forward when plaintiffs alleged that defendant's employees took bribes to decrease traffic to plaintiffs' website and increase traffic to competitors' websites).

As it happens, however, the case law is less helpful to Plaintiff than he believes. For example, in *IQ Dental Supply*, the Second Circuit allowed a tortious interference claim to go forward because the plaintiff "plausibly alleged that it suffered an antitrust injury resulting from the … direct boycott," meaning that the alleged conduct independently violated the law. Not so here, where there is no allegation that Amazon's actions constituted an independent violation of law.

And in *Dangaard*, the facts indicate that the *motivation* behind the defendant's traffic manipulation was itself wrongful. 2022 WL 17342198, at *2 (noting plaintiff's allegation that the defendant's employees "accepted bribes … to blacklist competitors"). But here, Plaintiff has offered no analogous nonconclusory allegations about the intentions behind Amazon's alleged actions. The *Dangaard* court offers no indication that its holding would be the same if, for example, the defendant had merely decreased traffic to the plaintiffs' website based on violations of the defendant's terms of service.

35

In theory, the most promising case for Plaintiff's tortious interference argument is *e-ventures Worldwide*, but that case applied Florida law, which does not have the wrongful means requirement. 188 F. Supp. 3d at 1278 (listing the elements of the claim under Florida law). Notably missing from each case that Plaintiff proffers is an example of a court finding an act wrongful that is expressly contemplated by the underlying contract, as in the instant case. Here, Plaintiff has alleged that (i) Amazon prevented users from accessing Plaintiff's music online; (ii) Amazon had the right to do so for proper reasons based on the underlying contract; and (iii) Amazon's proffered reason for doing so was pretextual. The Court is comfortable saying that these allegations could give rise to a violation of the covenant of good faith and fair dealing, *see supra* B.2, but it will *not* stretch the facts (or the law) and conclude that Amazon's alleged conduct was so egregious and culpable to support a tortious interference claim. *See Carvel Corp.*, 3 N.Y.3d at 190-91.[11]

### 5. Plaintiff's New York Civil Rights Law Claim Against Amazon Fails as a Matter of Law

To state a claim under New York Civil Rights Law §§ 50-51, "a plaintiff must prove [i] use of plaintiff's name, portrait, picture or voice [ii] 'for advertising purposes or for the purposes of trade' [iii] without consent and

---

[11]    Amazon suggests that even if Plaintiff's conjecture about the rival musician or label were sufficiently supported, that would not amount to wrongful means. (Amazon Br. 15-16). While the Court need not decide that issue here, it would likely disagree, given that the wrongful motivation would bring this case closer to *Dangaard* v. *Instagram, LLC*, No. C 22-01101 (WHA), 2022 WL 17342198, at *2 (N.D. Cal. Nov. 30, 2022). And in general, the Court finds unpersuasive Amazon's argument that the Court should decline to impose liability based on a shadowban simply because few New York courts have weighed in on this nascent area of law. (Amazon Reply 7 ("Many of Albert's other cases do not involve claims of tortious interference under New York law at all.")).

[iv] within the state of New York." *Hoepker* v. *Kruger*, 200 F. Supp. 2d 340, 348 (S.D.N.Y. 2002) (quoting *Titan Sports, Inc.* v. *Comics World Corp.*, 870 F.2d 85, 87 (2d Cir. 1989)). Plaintiff's claim fails on the third prong because he granted Amazon a written, perpetual, irrevocable, royalty-free license to use his NIL in connection with Amazon Music offerings.

To review, under Section 4.2 of the Terms and Conditions that Plaintiff signed, Plaintiff "grant[ed] to [Amazon] a non-exclusive, sub-licensable, worldwide, perpetual, irrevocable, royalty-free right and license to use, reproduce, distribute, transmit, perform, modify, and display all Artist Content," which includes NIL, "in any media and technology formats in connection with the Services and Amazon Music for Artists." (Terms and Conditions § 4.2). "Services" are those "provided by Amazon Music." (*Id.* § 1).

Plaintiff argues that his "consent to the use of his NIL was limited to promoting his music and once Amazon shadowbanned his music, Amazon acted outside of its limited right to use of Plaintiff's NIL." (Pl. Opp. 40). But as Amazon points out, the language of the Terms and Conditions nowhere establishes such limitations. (Amazon Br. 16-17). Instead, it is "perpetual" and "irrevocable," and it relates to all "services provided by Amazon Music" (Terms and Conditions §§ 1, 4.2).

Plaintiff's only way around this language is to argue that "Services" includes only those "tools allowing the artist to engage with his fan base." (Pl. Opp. 40-41). But that definition is atextual. In the Terms and Conditions, "Services" refers to "services provided by Amazon Music" — without further

restriction. (Terms and Conditions § 1). Amazon indicates that the Amazon Music for Artists platform "allow[s] artists … to … engage with their fans on … the 'Services,'" but nowhere is fan engagement adopted as necessary to qualify something as a "Service." (*Id.*).

In sum, as Amazon points out, Amazon Music for Artists is the "variety of tools and features" that facilitate fan engagement, but "Services" are simply the "services provided by Amazon." (Terms and Conditions § 1; *see also* Amazon Reply 9). In other words, the term "Services" has nothing to do with fan engagement and refers simply to Amazon's offerings. (Terms and Conditions § 1). So when Plaintiff provided irrevocable consent for Amazon to use his NIL "in connection with the Services," he did so notwithstanding any purported difficulties interacting with his fans. (*Id.* § 4.2). More pointedly, the circumstance of a shadowban did not automatically revoke Plaintiff's consent. As such, his allegations cannot amount to a claim under New York Civil Rights Law §§ 50-51. *See Hoepker*, 200 F. Supp. 2d at 348 (noting that a claim under this provision requires the use of NIL "without consent").

### 6. Plaintiff May Not Raise Injunctive Relief as an Independent Cause of Action Against Amazon

Amazon is also correct that Plaintiff cannot raise an independent cause of action for injunctive relief. This is because "injunctions are remedies, not causes of action." *Chiste* v. *Hotels.com L.P.*, 756 F. Supp. 2d 382, 406-07 (S.D.N.Y. 2010) (collecting cases); *see also Manrique* v. *State Farm Mut. Auto. Ins. Co.*, No. 21 Civ. 224 (KMK), 2021 WL 5745717, at *8 (S.D.N.Y. Dec. 2, 2021) (dismissing a claim for "injunctive relief"). Plaintiff appears to recognize

as much, stating that he "seeks an injunction as a remedy on his breach of contract and tortious interference claims," and not "as a standalone claim." (Pl. Opp. 43).  Consequently, Plaintiff's standalone claim for injunctive relief will be dismissed.  *See Seibel* v. *Nat'l Union Fire Ins. Co. of Pittsburgh*, 655 F. Supp. 3d 212, 223 (S.D.N.Y. 2023) (noting that "cause[s] of action for injunctive relief … are subject to 'dismissal with prejudice as a matter of law'" (alteration adopted) (quoting *Herley Indus., Inc.* v. *R Cubed Eng'g, LLC*, No. 20 Civ. 2888 (JFL), 2021 WL 229322, at *5-6 (E.D. Pa. Jan. 22, 2021))).

## CONCLUSION

For the reasons explained above, Amazon's motion to dismiss is GRANTED IN PART and DENIED IN PART, and DistroKid's motion to dismiss is GRANTED.  Plaintiff's claim against Amazon for breach of contract and his claims against DistroKid for breach of contract and accounting may go forward. Plaintiff has not sought leave to amend, and has already been granted leave to amend once, therefore, further leave to amend is DENIED.

Defendants shall file their answers on or before **April 17, 2026**.  On or before **May 8, 2026**, the parties shall submit to the Court a joint letter and proposed case management plan in accordance with the specifications laid out in the March 20, 2025 Notice of Initial Pretrial Conference.  (*See* Dkt. #10).  If the parties wish to have a conference to discuss case management concerns, they shall request so in their joint letter.

39

The Clerk of Court is directed to terminate the pending motions at docket entries 36 and 39.

SO ORDERED.

Dated:    March 13, 2026
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

40